UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GARED HANSEN,

    Plaintiff,

  v.

CITY OF SAN FRANCISCO, et al.,

    Defendants.

Case No. 12-cv-04210-JST

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In this action pursuant to 42 U.S.C. § 1983, Defendants the City of San Francisco ("City"), San Francisco Police Chief Gregory Suhr, and former San Francisco Police Chief George Gascón move for summary judgment, or in the alternative for partial summary judgment on several issues related to the two claims asserted against them. The Court will grant the motion.

## II. BACKGROUND

### A. Procedural History

Plaintiff Gared Hansen ("Plaintiff" or "Hansen"), a San Francisco police officer, brings this action against his employer, the City of San Francisco, the current Chief of Police, Gregory Suhr, and the former Chief of Police, George Gascón, for claims arising out of two separate disciplinary suspensions applied to Hansen. The first occurred in 2009 and the second in 2012. Complaint ("Compl."), ECF No. 1.

Hansen asserts the following claims against Defendants: (1) violations of his rights under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983 and (2) violation of his rights under the Equal Protection Clause in violation of 42 U.S.C. §1983.

Defendants move for summary judgment with respect to both of these claims. They argue that summary judgment is appropriate because, with respect to his First and Fourteenth

Amendment claim, Hansen has not met his burden to establish the elements of employer retaliation required by Eng v. Cooley, 552 F.3d 1062 (9th Cir. 2009).  Additionally, with respect to Hansen's Equal Protection claim, Defendants assert that Hansen has failed to demonstrate that he is a member of a protected class or that Defendants treated similarly situated individuals in a disparate manner.  Alternatively, Defendants seek partial summary judgment with respect to several issues related to Hansen's two claims.

### B. Factual Background

Plaintiff is a police officer currently employed by the City and County of San Francisco in its Police Department ("SFPD").  Hansen's two claims against the Defendants arise out of the events surrounding two separate suspensions levied against him by the SFPD.  The undisputed material facts are as follows:

#### 1. Hansen's 2009 Suspension

The SFPD received an anonymous letter on October 21, 2008, notifying it of alleged misconduct by Officer Hansen in violation of SFPD rules.  Declaration of George Gascón ("Gascón Decl."), ECF No. 38, ¶ 4.  The letter informed the department that Hansen owned and operated a website that displayed nude women and advertised his photography services.  Gascón Decl., Ex. A at 8.  The letter also included photographs from the website that appeared to show nude female models posing with Hansen's SFPD-issued firearm.  Id.  The SFPD's subsequent investigation revealed that Hansen advertised his photography services for a fee and offered the sale of prints, posters, and calendars.  Ex. A at 12-13.  Additionally, the investigation identified six different models who were holding Hansen's department-issued firearm in the photographs.  Ex. A at 13.  The SFPD Human Resources Department subsequently confirmed that Hansen had not requested permission to engage in secondary employment regarding his photography business, as is required by SFPD policy.  Id.  Finally, at some point during the investigation, Officer Hansen "admitted that the firearm depicted in several of the photographs was his Department-issued firearm and that all the firearms shown in the photographs were real firearms."  Id.  He does not dispute that he allowed various models to pose with his firearm, but has stressed multiple times that the weapon was "unloaded."  Ex. A at 17.

2

Hansen contends that the content of his photography was a motivating factor underlying his suspension. Plaintiff's Opposition to MSJ, ("Opp."), ECF No. 44, at 1:16-18. As evidence, Hansen provides the Management and Control Division's ("MCD") investigative report. Under the heading of "Focus of Investigation," the report lists the question: "Is the nature of Officer Gared Hansen's photography business a violation of the mission and values of the San Francisco Police Department?" Declaration of Christopher L. Gaspard ("Gaspard Decl."), ECF No. 44-5, Ex. 3 at 5. The MCD investigation concluded:

> the image [of a nude model pointing an SFPD owned firearm in a "WARRIOR" image] is certainly not in the spirit of the policing nor it is in line with the new Mission Statement of the San Francisco Police Department. Although it is not stated anywhere on the website that Gared Hansen is an SFPD officer, the website would most likely create a negative public opinion of the SFPD should the owner of this website ever be made public. Officer Hansen's website reflects discredit upon himself and the San Francisco Police Department.

Ex. 3 at 25-26. On June 17, 2009, former Chief of Police Heather Fong sent Officer Hansen a letter, informing him that she intended to cite him for engaging in conduct which violated Rule 9 of SFPD General Order 2.01 and General 11.02, specifically for "(1) allowing models to pose, in various stages of undress, with his Department issued firearm and (2) for advertising his photography business/services for pay without permission of the Chief of Police." Gascón Decl., Ex. A at 47-49. The letter made no mention that the content of Hansen's website constituted a violation for which Hansen was being suspended. Id. Officer Hansen requested a Chief's Hearing, which the SFPD subsequently held on December 9th, 2009.

Concurring with the recommendation of Deputy Chief of Police Kevin Cashman, who presided over the Chief's Hearing, then-Chief of Police and Defendant George Gascón suspended Officer Hansen for five days, with three days to be served at that time and two days held in abeyance for three years. Ex. A at 27. Further, the report concluded that "[i]f the website is still in existence with services and prices still be advertised, Officer Hansen should be required to seek permission from the Chief of Police to engage in secondary employment." Id. In a December 29, 2009 letter, Gascón notified Hansen of his suspension. Ex. A at 8-11. At the conclusion of the letter, Gascón added that "you have the right to appeal this suspension to the

3

Police Commission . . . pursuant to Appendix A, Section A8.343 of the Charter of the City and County of San Francisco."[1]  Id at 10.  Additionally, Gascón noted, if Hansen sought judicial review "pursuant to Code of Civil Procedure Section 1094.5, [he was required] to file action within the time limits specified by that section."  Id.  Hansen served his three day suspension and did not file an appeal to the Police Commission.

On June 8, 2009, after the initial internal investigation began, Officer Hansen submitted for the first time an application for secondary employment to the SFPD.  Declaration of Matthew J. Weinberg ("Weinberg Decl."), ECF No. 37, Ex. A ("Hansen Depo."), at 6:10-13.  The SFPD approved the secondary employment on June 18, 2009, which lasted for one year.  Hansen Depo. at 7:5-9.

### 2. Hansen's 2012 Suspension

Hansen was arrested for trespassing in Contra Costa County on March 6, 2010, leading the Contra Costa Sheriff's Department to file a complaint regarding Hansen with the SFPD. Amended Declaration of Robert Yick ("Yick Decl."), ECF No. 43, Ex. B-2, at 11.  The SFPD began an Internal Affairs Division ("IAD") investigation into Hansen's conduct during that arrest on March 6, 2010.  Ex. B-2 at 11-13. The investigation revealed that, on March 6, 2010, Hansen and two female models entered an enclosed, 100-acre parcel of private property containing the

---

[1] Defendants seek judicial notice of several documents.  ECF Nos. 41, 46.  The first includes several sections of the Charter for the City and County of San Francisco that describe the general powers and duties conferred to the San Francisco Police Department.  Three documents are General Orders issued by the San Francisco Police Department which discuss rules and regulations relating to the department's operation.  One document is a copy of the City and County of San Francisco Civil Service Rules Applicable to the Uniformed Ranks of the San Francisco Police Department.  The last is a section from the Charter for the City and County of San Francisco describing the role of the Police Commission.  ECF No. 46.  Hansen has not contested either request.  A court shall take judicial notice of a fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed.R.Evid. 201(b)(2).  Each document is a proper subject for judicial notice.  See City of Sausalito v. O'Neill, 386 F.3d 1186, 1224 n.2 (9th Cir. 2004) ("[courts] may take judicial notice of a record of a state agency not subject to reasonable dispute"); Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977) ("[C]ity ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice.")  Accordingly, Defendants' requests for Judicial Notice are GRANTED.

abandoned Byron Hot Springs Hotel ("Byron Hotel"). Ex. B-2 at B-17. The property is fully fenced and contains several signs that read "No Trespassing. Do Not Enter." Id. Additionally, the owners of the property employed two security guards whose job it was to patrol the property and notify the Sheriff's Department if they discovered trespassers. Id.

Hansen acknowledges that he solicited the models online and that he met them for the first time the day of the incident. Hansen Depo. at 9:23 – 10:21. Hansen and the models drove separately to the perimeter of the property, but after meeting, they all proceeded together toward the Byron Hotel. Yick Decl., Ex. B-4 at 30-31. After photographing the models wearing "vintage-looking corsets" for roughly an hour, Officer Hansen was confronted by Contra Costa Sheriff's Deputies Michaud and Spaulding on the second floor of the Byron Hotel. Ex. B-4 at 30. Deputy Spaulding informed Hansen and the models that they were trespassing on private property because they did not know the owner and did not have permission to be there. Ex. B-5 at 14. Hansen responded that "[i]t's not trespassing because we haven't been asked to leave yet." Id. Next, Deputy Michaud asked Hansen and the two models for identification. Hansen presented an expired San Francisco Police Department identification card. Id. While Sergeant Douglas called the SFPD directly to verify Hansen's active status, Deputy Spaulding asked Hansen if he was armed, to which Hansen replied that he was. Id. Spaulding estimated that the deputies had been talking with Hansen for "five to ten minutes" before asking him if he was armed. Id.

At some point during the encounter, Hansen presented Deputy Rector with a business card advertising his personal photography website. Ex. B-5 at 19. Sergeant Douglas told the deputies to issue trespassing citations to Hansen and the two models.

After being issued the trespassing citation, Hansen assured the two models not to worry because the District Attorney would not file charges. Ex. B-4 at 36:23–37:18. Deputy Rector noted that once Hansen identified himself as a police officer, Hansen's demeanor changed from surprised to "cocky." Ex. B-5 at 18. Sergeant Douglas emphasized that the deputies complained to her about Hansen's attitude during the incident, saying that "they felt they were 'being talked down to' because he had received superior training as a member of [the SFPD]." Ex. B-5 at 24.

5

Following the citation, Hansen provided a written report of the incident to the SFPD on March 9, 2010, as required by SFPD policy. Ex. B-3 at 13-14. In the report, Hansen wrote, "I was in Byron CA photographing a historic ruin." Id. He later added that "I was photographing the ruin with a couple of my friends" and "the officers cited me and my friends." Id. When asked by an investigator why he referred to the two hired models as "friends" in his written report, Hansen responded, "[m]aybe you have a different definition of friends [than I do]." Ex. B-4 at 42:8-9.

The Interim Chief of Police Jeffery Godown sent Hansen a letter on January 18, 2011, notifying him that the Chief of Police had received a recommendation that Hansen be disciplined for violating Rule 9 of Department General Order 2.01. Ex. B-1 at 29-30. Hansen again requested a Chief's hearing regarding his impending discipline. The Chief's meeting took place on December 1, 2011. Ex. B-8 at 28. During the Chief's Hearing, Commander Sandra Tong took into account the contents of the IAD investigation, as well as statements offered by Hansen and SFPD Captain Gregory Corrales. Ex. B-8 at 28-31. Hansen explained that he believed that his photography business was protected by the First Amendment and that the decision to bring charges against him was "solely related to his off-duty business." Ex. B-8 at 30. He further claimed that the IAD was retaliating against him because of the 2009 suspension. Id. According to the Chief's Disciplinary Hearing Report, Officer Hansen "basically denied every allegation of misconduct and stated that it was clear that the IAD investigator did not like his off-duty business. He was unapologetic and rather defiant in his position." Id. At the conclusion of the hearing, Commander Tong concluded:

> It is clear that Officer Hansen was trespassing on March 6, 2010 when Contra Costa Sheriff's deputies found him and two women on the second floor of the abandoned property. Officer Hansen was rude and unprofessional. It was clear he did not take the situation seriously as evidenced by his nonchalant comments to the deputies. He provided them with an expired SFPD ID card and his business card. He was contradictory in their presence and seemed to undermine their authority. His memorandum was missing information and his overall conduct was not that expected of a member of this Department. At his Chief's hearing, he expressed no remorse, and that coupled with his Captain's opinion, only serves to support this conduct. Therefore, it is clear that Rule 9 of DGO 2.01 was violated.

Ex. B-8 at 31. Chief Suhr concurred with Commander Tong's recommendation that Officer Hansen "serve the two-day suspension being held in abeyance from [his prior suspension] and receive a 10-day suspension for his conduct in his case." Id. The suspension provided, "[e]ight days will be served in conjunction with the two (2) days [from his prior suspension] for a total of 10-days. Two (2) days from this case will be held in abeyance for three years." Id. Hansen elected not to appeal Chief Suhr's suspension. Hansen Depo. at 14:24 – 15: 1.

Hansen again contends that the content of his photography was a motivating factor underlying his 2012 suspension. Opp. at 1:16-18. Hansen provides a copy of the 2012 IAD investigation into the incident. Gaspard Decl., Ex. 2 at 2-7. The IAD investigation concluded Hansen committed five separate violations. The third concluded:

> Officer Gared Hansen participated in Conduct Unbecoming an Officer by maintaining a photography web site which reflected discredit upon the Department. . . . During his contact with Contra Costa County Deputies, Officer Hansen invited at least one of them to view his site. The deputies who viewed Officer Hansen's site all expressed concern that a member of the law enforcement community was operating such a site. . . . The allegation of Conduct Unbecoming an Officer is deemed Improper Conduct.

Ex. 2 at 5. The IAD report recommended that Hansen receive punishment for five counts of "Conduct Unbecoming an Officer," listing the specific violations as "arrest," "conduct toward deputies," "website," "expired identification," and "misleading memorandum." Id. Defendant Suhr imposed the ten-day suspension by checking a line stating "I concur" and signing his name below the recommendation of Commander Tong. Yick Decl., Ex. B-8 at 31. Suhr did not further elaborate on the basis of Hansen's suspension.

### C. Jurisdiction

The Court has jurisdiction over this action under 42 § U.S.C. 1983.

### D. Legal Standard

When considering a motion for summary judgment or partial summary judgment, "the court must draw all reasonable inferences in the light most favorable to the non-moving party. Johnson v. Rancho Santiago County Cmty. Coll. Dist., 623 F.3d 1011, 1018 (9th Cir. 2010). However, unsupported conjecture or conclusory statements do not defeat a genuine dispute as to

7

material fact and will not defeat summary judgment.  Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).  Partial summary judgment is appropriate for "part of each claim or defense" provided that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P 56(a).

A fact is "material" if it might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248-49 (1986).  A "genuine dispute" over any such fact exists only where there is sufficient evidence from which a reasonable jury could find for the non-moving party.  Id. at 248.  In considering a motion for summary judgment, the "court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the moving party for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial.  See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  Greer v. Lockheed Martin Corp., 855 F. Supp. 2d 979, 985 (N.D. Cal. 2012).  If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  It is not the duty of the district court "to scour the record in search of genuine issue of triable fact." Id.  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and

internal quotation marks omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. See Celotex Corp. v. Caltrett, 477 U.S. 317, 323 (1986).

### III. ANALYSIS

The Court first addresses Defendants' motions for partial summary judgment on the issues of the statute of limitations, municipality liability under Monell, and qualified immunity.

#### A. Statute of Limitations

Defendants assert that any claims arising from Hansen's December 29, 2009 suspension are barred by the statute of limitations. (Mot. Summ. J. ("MSJ"), ECF No. 36 at 11:12-14.) Hansen contends that because the two days of suspension held in abeyance from his 2009 suspension were applied to him as part of his 2012 suspension, any claims arising from the 2009 suspension are timely and within the applicable limitations period. (Opp. at 6:4-27.)

The text of 42 U.S.C. § 1983 provides no explicit limitations period. Instead, "the statute of limitations applicable to an action pursuant to 42 U.S.C. § 1983 is the personal injury statute of limitations of the state in which the cause of action arose." Alameda Books, Inc. v. City of Los Angeles, 631 F.3d 1031, 1041 (9th Cir. 2011). In California, the statute of limitations period for personal injury claims is two years. Cal. Civ. Proc. Code § 335.1.

To determine the timeliness of the § 1983 claim, the Court must determine whether Hansen alleged "discrete acts that would violate the Constitution that occurred within the limitations period." RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1058 (9th Cir. 2002); see also Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (per curiam). It is the role of the court to "look at when the operative decision occurred" and "separate from the operative decisions those inevitable consequences that are not separately actionable." RK Ventures, Inc., 307 F.3d at 1058.

The statute of limitations begins running when the operative decision is made, not when the decision is carried out. Delaware State Coll. v. Ricks, 449 U.S. 250, 256 (1980); see also Chardon, 454 U.S. at 8. In Ricks, the trustees of Delaware State College denied tenure to plaintiff Ricks, a professor at the college. Id. at 250. However, they offered him a "terminal" contract, which allowed him to teach one additional year before being officially terminated. Id. Ricks later

9

sued the college, claiming that their denial of tenure was discriminatory. Id. The Court held that the limitations period "commenced when the tenure decision was made and Ricks was notified, not when the employment ended." Id. at 258. In a similar case, Chardon, involving a claim under § 1983, the Court concluded that the applicable limitations period began to run when plaintiffs, several non-tenured administrators at the Puerto Rico Department of Education, were given notice of termination, not on the date that their employment was actually terminated. 454 U.S. at 8. The Court maintained that "[t]he fact of termination is not itself an illegal act . . . the illegal act was . . . discrimination in the tenure decision." Id.

As applied here, the fact that Defendants held Hansen's suspension in abatement for two years and applied his days of punishment in 2012 does not bring his claims within the statute of limitations. Instead, the City's decision to institute the punishment was the operative alleged illegal act. The operative act in question is the former Chief of Police's letter, sent to Hansen on December 29, 2009, stating his imposition of a suspension. (Declaration of Gregory P. Suhr ("Suhr Decl."), ECF No. 39, Ex. A at 4-7).

Hansen cites to no authority supporting his contention that the claims arising out of his 2009 suspension are timely. Instead, he disputes that his two suspension days held in abeyance were "inevitable consequences" of his initial 2009 suspension. (Opp. at 6.) In support, Hansen proffers a hypothetical situation in which a public employee "has an employment termination held in abeyance and decides to speak about his or her municipal employer on matters of public concern." Id. Again unsupported by any legal authority, Hansen concludes that "if the government employer imposed the termination on the following day based on the employees speech . . . [o]f course it would . . . [be] a new adverse action." Id. Claiming that this case involves facts "no different as a matter of law," Hansen concludes that the Court should deny Defendants' motion for partial summary judgment on this issue. Id. Assuming *arguendo* that this hypothetical and Plaintiff's counsel's deduction from it are accurate statements of the law, the employee in the hypothetical would still only be able to challenge whether the decision was made "based on the employees speech." He would not be able to resurrect claims challenging the employer's reasons for imposing the termination in the first place. Because the operative decision

1  occurred on December 29, 2009, any claims arising from conduct occurring before December 29,
2  2011 are barred by the statute of limitations. Accordingly, because Hansen filed this action on
3  August 9, 2012, Defendant's motion for partial summary judgment on this issue is GRANTED.[2]

### B. Monell Liability

Defendants move for partial summary judgment on all claims against the City of San Francisco on the grounds that Hansen's suspension was not made pursuant to an official policy, which prevents prevent liability from attaching to the City. Hansen contends that the testimony in the case "makes it obvious that Chief Gascón and Chief Suhr are policymakers for the purposes of [his] discipline." Opp. at 11:21-22.

A municipality may only face liability where the municipality "itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Ulrich v. City and County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002) (quoting Monell v. Dep't of Soc. Serv. of N.Y., 436 U.S. 658, 694 (1978)). The Supreme Court has characterized this requirement as "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipality liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 489, 479-80 (1986).

To show municipality liability, a plaintiff may make one of several showings. First, a plaintiff may show a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989). Hansen has not attempted to show that the City of San Francisco has an unconstitutional "longstanding practice or custom." However, beyond this, there are two additional ways a plaintiff may establish the liability of municipal defendants:

> (1) by showing that the decision-making official was, as a matter of

---

[2] As a practical matter, this entitles Defendant Gascón to judgment since he is only potentially liable for the 2009 actions. See discussion *infra*.

>state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (2) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

Ulrich, 308 F.3d at 985-86.

Whether a particular official has final policymaking authority is a question of state law. See McMillian v. Monroe County, 520 U.S. 781, 786 (1997); Cortez v. County of Los Angeles, 294 F.3d 1186, 1189 (9th Cir. 2001). The fact that a city employee has independent decision-making power does not render him a final policymaker for purposes of municipal liability. Schiff v. City and County of San Francisco, 816 F. Supp. 2d 798 (N.D. Cal. 1993). "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988).

This Court has twice previously addressed whether, for purposes of Monell liability, the San Francisco Police Department's Chief of Police serves as a policymaker with regard to employment decisions. See Schiff, 816 F. Supp. 2d at 798; Coming Up, Inc. v. City and County of San Francisco, 830 F. Supp. 1302 (N.D. Cal. 1993).

In Schiff, plaintiff Frederick Schiff brought a discrimination suit against the City and the police chief. 816 F. Supp. 2d at 804-08. To analyze Schiff's Monell claims, the court examined the California Constitution and the Charter of the City and County of San Francisco ("Charter"), because San Francisco is a charter city under the California Constitution.[3] After analyzing numerous sections of the Charter, the Court concluded that "Chief [of Police] Fong did not have final policy policymaking authority with respect to promotion decisions." Id. at 813. Under the City Charter, "[Department management] authority lies with the Police Commission." Id.; see

---

[3] Under the California Constitution, a charter city has explicit authority to "constitute, regulate, and govern" its city's police department. Brown v. City of Berkeley, 57 Cal.App.3d 223, 236 (Cal. 1976). Although Cal. Gov. Code § 38630(a) provides that "the police department of a city is under the control of the chief of police," the provision only applies to general law cities, not charter cities. Brown, 57 Cal.App.3d at 236; see also Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 953 (N.D. Cal. 2010).

also, Coming Up, 830 F. Supp. 1302, 1308-09.

This court reached a similar conclusion in Coming Up. 830 F. Supp. at 1315. In that case, Coming Up, Inc., the corporation that published the *Bay Times*, a free, biweekly newspaper, sued the City of San Francisco and the Chief of Police for allegedly ordering the seizure of between 2,000 and 4,000 copies of the paper. Id. at 1304. The Chief of Police was reportedly angry and ordered officers to seize the papers in reaction to the previous day's *Bay Times* front page, containing a picture of the Chief's face superimposed on the body of someone dressed in a police uniform, holding a police baton in a provocative fashion between his legs. Id. Again, to evaluate the plaintiffs' Monell claims, the Court undertook a searching examination into the text of the City Charter. Id.

First, the court noted that Section 3.530 of the Charter provides that the Police Commission "shall have the power and duty to organize, reorganize and manage the police department." Id. at 1309. Further, the Commission, not the Chief of Police, has the power to "prescribe reasonable rules and regulations" under § 3.5000(a). Id. at 1308. The Police Commission instead "shall appoint a chief of police who shall hold office at its pleasure." Id. at 1308. The Charter also clearly prescribes in § 3.501 that each "appointive department head shall be immediately responsible to the [appointing commission] for the administration of his department, and shall file an annual report and make such other reports, estimates, and recommendations at the time and in the manner required by law, or as required by the [appointing commission.]" Id. at 1309. "The Charter plainly indicates that the Commission is a policy maker, but this does not necessarily mean that it is the only policymaker for the Police Department and . . . that it was the policy maker with respect to the policy at issue." Id. After examining several provisions of the Charter that revealed that "the Chief possesses some authority, and certainly retains wide discretion to perform his duties," the Court emphasized that the Charter "did not lend any specific support to the notion that [the Chief] is the final policymaker for the policy at issue." Id. After looking to other sources governing specific policies relating to newspaper collection not applicable to our case, the court concluded that "[e]ven if the Chief has some policymaking role for the policy at issue, the evidence demonstrates that the Commission is the final authority on

1 policy." Id. at 1314. "The Chief's decisions are reviewable." Id. The City Charter provides that the Chief serves at the Commission's pleasure and is immediately responsible to the Commission." Id.

To determine whether the Chief of Police had any policymaking authority with respect to the policy at issue in this case, it is necessary to examine relevant sections of the Charter. Notably, Section A8.343 provides that "[a]ny such member so suspended [by the Chief] shall have the right to appeal such suspension . . . to the police commission . . . and have a trial and hearing on such suspension." Defs. Req. for Judicial Notice, ECF No. 41-1, Ex. A at 8. Further, the next section, A8.344, reveals that "the chief of the police department . . . may temporarily suspend a member of the . . . department pending a hearing before the police . . . commission on disciplinary charges against the member, and the member shall be entitled to a prompt administrative hearing to determine if he or she should remain suspended pending the outcome of the commission proceedings." Id. (emphasis added). Though section A8.343 provides that "[t]he decision of the appointing officer in all cases of suspension for disciplinary purposes shall be final," the adjacent section explains the specific procedures governing "fine, suspension and dismissal in police and fire departments." Id. Those more specific procedures, see *supra*, provide that the Police Commission has final authority to adjudicate appeals of suspensions carried out by the Chief of Police. See United States v. Navarro, 160 F.3d 1254, 1256 (9th Cir. 1998) ("[I]t is an elementary tenet of statutory construction that where there is no clear indication otherwise, a specific statute will not be controlled or nullified by a general one . . ..")

Hansen cites deposition testimony from former Chief Gascón and current Chief Suhr, noting that each individual "made the final decision to discipline Plaintiff." Opp. at 11:15-18. However, these decisions were not necessarily "final" because Hansen had the opportunity to appeal them, and have the Chief's decisions reviewed by the Police Commission. Hansen never appealed his suspension, but rather chose to file a civil action in this Court. Additionally, the San Francisco City Charter also provides that "the Chief of Police may be removed by the Commission or the Mayor" and "the Police Commission is empowered to prescribe and enforce any reasonable rules and regulations it deems necessary to provide for the efficiency of the Department . . . ."

14

Defs. Req. for Judicial Notice, ECF No. 46, Ex. A at 23.  In addition, Section 10.101 of the City Charter provides that "[t]he Commission shall by rule establish procedures to review and resolve allegations of discrimination as defined in Article XVII of this Charter. . . . [and] [t]he decisions reached under Commission procedures shall be final and shall be forthwith be enforced by every employee and officer." ECF No. 41, Ex. A. at 4.  With respect to issuing suspensions to members of the police department, provisions of the Charter make clear that the Police Commission, not the Chief of Police, retains final authority.

As an alternative, "final policymaking liability may attach to the City if it can be shown that it "delegated [its final policymaking authority] to, or ratified the decision, or a subordinate." Ulrich, 308 F.3d at 986.   However, the San Francisco City Charter maintains that the Police Commission retains the authority to hear appeals of employment-related decisions of state employees.  ECF No. 41 at 41-1: 8.  This includes the employment decisions of the Chief of Police.  As a matter of law, neither former Chief Gascón nor Chief Suhr were delegated *final* policymaking authority, and since Plaintiff did not appeal his suspension the Police Commission could not be said to have ratified the decision.

At oral argument, Plaintiff's counsel acknowledged that he was unaware of any published authority supporting his argument that municipality liability could attach under the facts of this case.

Accordingly, the City is entitled to judgment as a matter of law that municipality liability does not attach for the actions challenged in the complaint.  Defendants' motion for partial summary judgment on this issue is therefore GRANTED.

**C.     Qualified Immunity of Defendants Suhr and Gascón**

Defendants assert that both current Chief of Police Suhr and former Chief of Police Gascón are entitled to qualified immunity.  The defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "A Government official's conduct violates clearly established law when, at the time of the

15

challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every "reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, __ U.S. __, 131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). Regardless of whether the constitutional violation occurred, "the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624 (9th Cir. 1991).

Before Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court applied a two-step process to analyze a claim of qualified immunity. Saucier v. Katz, 533 U.S. 194 (2001). First, the reviewing court must consider whether a constitutional right was violated. Id. at 195. If the court found no violation, the inquiry would stop and the official would be entitled to qualified immunity. Id. However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is whether the [violated] right was clearly established." Id. At this second step, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Id. (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

However, in Pearson, the Court determined that courts need not necessarily first determine whether a constitutional violation occurred when deciding whether a particular defendant is entitled to qualified immunity. 555 U.S. at 225. The Court noted that "when qualified immunity is asserted at the pleading stage, the answer to whether there was a violation may depend on a kaleidoscope of facts not fully developed . . . [a]nd the first step may create a risk of bad decisionmaking, . . . ." Id. A strict adherence "to Saucier departs from the general rule of constitutional avoidance . . . ." Id. "There are circumstances in which the first step of the Saucier procedure may create a risk of bad decisionmaking." Id. at 239. Among other reasons, the "lower courts sometimes encounter cases in which the briefing of constitutional questions is woefully inadequate." Id. (citing Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005)).

As the Court noted *supra*, any claims arising out of Hansen's 2009 suspension are barred by the statute of limitations. Since Former Chief Gascón played no role in Hansen's 2012 suspension, Plaintiff's claims against him are barred. However, assuming *arguendo* that claims

16

1   arising from Hansen's 2009 suspension are not barred by the statute of limitations, the Court will
2   consider the applicability of qualified immunity to both Defendant Suhr and Defendant Gascón.

3         Hansen claims that his "right to be free of government retaliation based on the exercise of
4   his artistic expression was clearly established at the time of the adverse actions." Opp. at 12:19-
5   21. As support, Hansen contends that "the Ninth Circuit has 'held as early as 1982 it could hardly
6   be disputed that . . . an individual had a clearly established right to be free of intentional retaliation
7   by government officials based upon that individual's constitutionally protected expression.'" Opp.
8   at 12:9-11 (quoting Soranno's Gasco, Inc. v. Morgan, 847 F.2d 1310, 1319 (9th Cir. 1989)
9   (internal quotation marks omitted)). In Sorrano's Gasco, the plaintiffs, who sold and distributed
10  petroleum products in central California, contended that the government defendants suspended
11  Gasco's petroleum bulk plant permits and discouraged its customers from doing business with
12  Gasco in retaliation for Mr. Soranno's public criticism of the Stanislaus County Air Pollution
13  Control District. Id. at 1312. In rejecting several individual defendants' motions for partial
14  summary judgment on the issue of qualified immunity, the Court found that the right to be free
15  from government retaliation based on an individual's constitutionally protected expression was
16  clearly established. Id. at 1319 (citing Allen v. Scribner, 812 F.2d 426, 436 (9th Cir. 1987)).

17        This case is far different from Sorrano's Gasco. First, in Sorrano's Gasco, the plaintiff was
18  a private entity required to obtain air permits from the local government in order to operate its
19  business. Id. at 1312. With regard to its relationship with the permitting governmental entity,
20  plaintiff Sorrano's Gasco Inc. was no different than a member of the general public. Sorrano's
21  Gasco Inc. was a private entity required to obtain a government permit in order to operate its
22  business.

23        Here, however, Hansen is not a member of the general public, but rather an employee of a
24  government entity. In the public employment context, the Supreme Court has established that "a
25  governmental employer may impose certain restraints on the speech of its employees, restraints
26  that would be unconstitutional if applied to the general public." City of San Diego v. Roe, 543
27  U.S. 77, 80 (2004). In Roe, the Supreme Court found that the San Diego Police Department was
28  justified in firing one of its officers for producing and selling sexually explicit videos. Id. More

recently, the Ninth Circuit also found in favor of a police department who fired an officer for running a sexually explicit website, stating that "Ronald Dible may have the constitutional right to run his sex oriented business, but he has no constitutional right to be a policeman for the City at the same time." Dible v. City of Chandler, 515 F.3d 918, 931 (2007).

In light of these holdings, it cannot be said that Suhr or Gascón knowingly or recklessly violated "clearly established law" in this case. Given Roe and Dible, qualified immunity might apply even if Suhr and Gascón had suspended – or even fired – Hansen for the specific reason that he produced sexually explicit photography. But the Court need not resolve that question, because this case presents an even easier one: whether qualified immunity attaches when an official disciplines a police officer for reasons *unrelated* to his photography, but in which the topic of sexually explicit websites was prominently mentioned in the investigation. Suhr and Gascón did not violate clearly established law by suspending Officer Hansen for numerous SFPD violations, simply because Hansen's sexually explicit website was featured in the underlying investigation documents.[4] Nor can it be said that every reasonable officer would have understood that it would be unlawful to approve the suspensions.

In Dible, the Ninth Circuit noted that because "whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, *if ever*, be sufficiently 'clearly established' to preclude qualified immunity." 515 F.3d 918, 930 (9th Cir. 2007) (quoting Moran v. Washington, 147 F.3d 839, 847 (9th Cir. 1998)) (emphasis added). This is not one of those rare cases in which Hansen's right, as a government employee, even if violated, was so clearly established to prevent Suhr and Gascón from being entitled to qualified immunity.

As a matter of law, Defendants Gascón and Suhr are both entitled to qualified immunity.

///

---

[4] Both investigations presented as evidence that the content of Hansen's photography brought discredit to the Department. However, neither suspension clearly indicated that it was imposed directly for the content of Hansen's photography; instead both were based on Hansen's numerous other violations of SFPD policies. See *supra* Part II-B; *infra* Part III-D(2).

18

### D. First Amendment Employer Retaliation and Equal Protection Claims

The combined effect of the Court's grants of partial summary judgment with regard to the statute of limitations issue, the Monell issue, and the qualified immunity issue entitle each Defendant to judgment in their favor on all of the claims asserted in this action. See *supra* Part III-A-C. Accordingly, the Court does not reach the merits of Hansen's claims for employer retaliation in violation of the First Amendment and Fourteenth Amendments or violation of his rights under the Equal Protection Clause.

## IV. CONCLUSION

Defendants' motion for summary judgment is GRANTED. Partial summary judgment is granted to Defendants on the statute of limitations issue, the Monell issue, and the qualified immunity issue, as set forth above. Each Defendant is entitled to judgment as a matter of law. Defendants shall submit a proposed order of judgment consistent with the Court's opinion.

**IT IS SO ORDERED.**

Dated: March 31, 2014

_____
JON S. TIGAR
United States District Judge